UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


Marcia Fields,                    :  Case No. 1:06-cv-668
                                  :
     Plaintiff,                   :
                                  :
vs.                               :
                                  :
Sheriff Deputy John Doe, et al.,  :
                                  :
     Defendants.                  :


**ORDER**

Before the Court is the Plaintiff's motion for summary
judgment against various Brown County entities, the Pleasant
Township Trustees, and the United States.  (Doc. 38)  The Brown
County defendants have responded (Doc. 39).  The Pleasant
Township Trustees oppose the motion (Doc. 44), and have also
filed a separate motion for judgment in their favor.  (Doc. 43)
Plaintiff has filed a reply (Doc. 45).  The United States has not
appeared in this case to date.

**FACTUAL BACKGROUND**

Plaintiff and her parents own a home and property in Brown
County.  Plaintiff's claims in this case are based on a long
series of events that her complaint alleges began on December 7,
2002.  On that day, Plaintiff (an African-American) was
confronted by a group of men who were hunting on her family's
land.  The men allegedly held Plaintiff at gunpoint and

-1-

threatened her using racial epithets.  When the men left,
Plaintiff called the Brown County Sheriff to report the incident.
She reported that two of the men were her neighbors, Rick and Bob
McElroy.  The deputy sheriff who responded (Deputy White) told
Plaintiff and her family that the incident was one for the Game
Warden to address.  Plaintiff and her family made several follow-
up inquiries to the Sheriff about investigating the incident,
which Plaintiff contends were ignored.  However, Deputy White
charged Rick McElroy with criminal trespassing a few weeks later.
Deputy White later testified that he believed that Plaintiff knew
where her property line was, and that McElroy had been hunting on
her property.  (Plaintiff's Exhibit J at pp. 199-200.)

On January 12, 2003, Plaintiff saw two men on her property.
She called "911" and alleges she was told that the men were
allowed to be there because they were looking for property line
markers.  The men were apparently the McElroys.  Despite the
criminal trespass charges filed against McElroy, Plaintiff and
her family contend that the county authorities did not take their
complaints seriously, and dismissed the conflicts with the
McElroys as a private boundary dispute.

The evidence in the record reflects that Rick and Dana
McElroy, the adjoining landowners, met with the Pleasant Township
Trustees on January 7, 2003.  The hand-written meeting notes
state the McElroys had a "fence problem" with Plaintiff and her

-2-

family.  The Trustees told the McElroys that the boundary line
should be checked by the deeds or by the surveyor before a
boundary fence could be built.  (Plaintiff's Exhibit F-2, Doc.
14.)  Encounters between Plaintiff and the McElroys continued
over the winter and spring, and several calls to the Brown County
sheriff from Plaintiff about trespassing and harassment are
documented in sheriff reports.

The McElroys' attorney wrote to Plaintiff and her family on
January 16, 2003, stating that the McElroys were initiating a
statutory partition fence action, and warning Plaintiff's family
not to threaten his clients in the future.  (Plaintiff's Exhibit
F-7) The same day, January 16, Chief Dunn of the Brown County
Sheriff's department met with Plaintiff about her complaints
about the McElroys.  Dunn's memo (actually written on August 13,
2003) states he sent copies of the police reports and of the 911
tapes to the FBI, given Plaintiff's belief that the prior
incidents were racially motivated.  Chief Dunn's memo states that
as of August 13, he had not heard from the FBI.

The Brown County prosecuting attorney wrote to Plaintiff on
January 24, 2003, stating that a surveyor needed to view the
property line in order to support the trespass charge.  The
prosecutor's letter mentions Plaintiff's request for aggravated
menacing charges against McElroy and the other men, but he also
states that threats were made by Plaintiff and her family against

-3-

the McElroys, which the prosecutor believed "complicated the situation."  The prosecutor told Plaintiff that the investigation was continuing.  (Plaintiff's Exhibit F-11.)  Plaintiff objected to conducting any line survey because survey maps on file with the county would sufficiently establish the property line. (Plaintiff's Exhibit F-10)

McElroy met again with the Township Trustees on February 4, 2003, informing them that he had the line surveyed and had hired a bulldozer to clear the property line.  The Trustees' minutes state that Plaintiff's letter to the prosecutor objecting to any survey was read at the meeting, but "no action" was taken.  The bulldozing arranged by the McElroys apparently started on March 10 or 11.  The dozer operator cleared and graded a section of Plaintiff's property, prompting Plaintiff to report the incident to the sheriff.  Apparently the sheriff intervened, because the minutes of the March 18 Trustees' meeting state that Plaintiff had called Trustee Hanselman and told him that the bulldozing had stopped.  The meeting minutes also state: "This matter will have to be resolved but not by the trustees.  The trustees are to see that the line fence is built.  They have no say about trespassing."

The Trustees sent a May 8, 2003 letter to Plaintiff and to the McElroys, setting a meeting for June 14 on the property to discuss the fence line.  (Plaintiff's Exhibit F-20)  This letter

-4-

was written after several media articles were published about Plaintiff's belief that she and her family were victims of racially motivated hate crimes, and that county authorities were not responding to the seriousness of the situation. Shortly after the May 8 letter was sent, the county sheriff received complaints about water flowing from Plaintiff's property and ponding on a public road. Plaintiff states that the unauthorized bulldozing on her property created this runoff problem.

McElroy's criminal trespass jury trial was held in August 2003. Transcript excerpts in the record establish that Plaintiff, her brother and Deputy White testified for the state, and that various members of the McElroy family including the defendant, Rick McElroy, testified for the defense. A tape of a 911 telephone call was played for the jury, but was largely inaudible according to the transcript excerpts. The jury acquitted McElroy of the trespass charges. Plaintiff alleges that the trial was unfair, that the prosecutor did not fully present the case, and that the defense lawyer was permitted to badger and belittle her in front of the jury. After the trial, incidents involving Plaintiff and her neighbors continued, with several police reports in the record reflecting these incidents. There is no indication that anyone was arrested or charged as a result of these reports (other than one hunter, who killed a deer on Plaintiff's property and was cited by the game warden).

In August 2004, the Township Trustees notified Plaintiff and the McElroys of another fence line meeting to be held on August 21. (Plaintiff's Exhibit G-8) Plaintiff objected to attending any meeting with the McElroys. The prosecutor's August 20 response notes that state law required the Trustees to set a viewing date, to physically walk the fence line, and then to apportion responsibility for construction and cost of the partition fence. The prosecutor asked Plaintiff to attend the meeting or to send a representative, noting that Plaintiff had already hired a surveyor. (Plaintiff's Exhibit G-12) A family friend apparently attended the August 21 line meeting. The record contains his August 23 letter to Township Trustee Hanselman expressing his concern about continuing conflicts between Plaintiff's family and the McElroys, which were centered on one specific area between their adjoining properties. His letter mentions another confrontation between the parties on the evening of August 21, which he described as involving guns. (Plaintiff's Exhibit G-13)

Plaintiff wrote to the prosecutor on August 24, to remind him that the damage to her property from the 2003 bulldozing done by the McElroys had not been repaired. Her letter also mentions a June meeting between Plaintiff's then-attorney Mr. Cummins, the Trustees and the McElroys, at which time some agreements on building the fence may have been discussed.

-6-

The Trustees then notified Plaintiff and the McElroys that
they would meet on October 19, 2004 to discuss the fence cost
apportionment.  Plaintiff, her attorney, and the McElroys all
attended, but no specific agreement on the costs of the fence was
formalized.  The Trustees signed a formal order apportioning the
fence construction and costs on February 1, 2005, which was sent
to Plaintiff by the prosecuting attorney on February 16, 2005.
The Order essentially divides the costs and responsibility
equally between the two landowners.  (Plaintiff's Exhibit H-1)

        Plaintiff then filed a lawsuit in Brown County Common Pleas
Court in March 2005 against the McElroys and the three Township
Trustees involved in the partition fence proceedings, seeking
damages to the property caused by the bulldozing.  According to
the docket sheet available on-line, the McElroys were granted
summary judgment after Plaintiff failed to timely respond to
requests to admit.  (The most recent on-line docket entry is
dated August 24, 2006, granting the Trustees' motion for leave to
answer.)

        On March 14, 2005, three days after Plaintiff filed her
state civil lawsuit, the Brown County Health Department filed a
complaint against Plaintiff and her family, citing a leaking
septic pipe draining onto adjoining property.  The complaint was
apparently initiated by the McElroys.  On April 13, Plaintiff
filed a nuisance complaint with the Health Department against the

McElroys for the damage done by the bulldozing in 2003. The county later obtained a search warrant to sample water coming from the pipe on Plaintiff's land, which apparently was leaking sewage. Several violation notices were sent to Plaintiff, culminating in the Health Department's October 21 condemnation notice. The record does not reflect the status of Plaintiff's nuisance complaint against the McElroys for the bulldozing damage.

Plaintiff then filed her pro se complaint in this action on August 29, 2006, alleging that all of the state, county and federal agents and agencies involved in all of these events violated her civil and constitutional rights. She sought an injunction against the condemnation of her property, against ongoing "threats and intimidation" by the Defendants, and significant money damages.

At a status conference in January 2007 before Magistrate Judge Hogan, Plaintiff reached an agreement with the Brown County Health District to avert the threatened condemnation of her property. The Health District and its agents were voluntarily dismissed following this settlement. (See Doc. 31)

This Court subsequently granted motions to dismiss or for judgment on the pleadings in favor of the Brown County Sheriff's Department, the County prosecutor, and the County Commissioners. The Court also dismissed claims against Brown County Judge John

-8-

Doe and the Brown County Court, the State of Ohio, and the Ohio Department of Health.  (See Doc. 37)  The only named defendants then remaining in the case were the Pleasant Township Trustees and the federal defendants.

Plaintiff's current motion seeks judgment against the previously dismissed Brown County prosecutor, sheriff, and commissioners.  In fairness to Plaintiff, the Court notes that an order to show cause (Doc. 36) granted Plaintiff until April 5 to respond to Brown County's motion to dismiss.  Plaintiff apparently did not receive the show cause order until March 29, which was after the order granting Brown County's motion was entered.  The Court will therefore consider Plaintiff's arguments contained in her April 5 motion (Doc. 38) as also raised in opposition to the Brown County defendants' motion for judgment on the pleadings (Doc. 29).

Plaintiff's claims against all the defendants are largely premised on 42 U.S.C. §1983, alleging the defendants violated her constitutional rights while acting under color of state law.

**ANALYSIS**

1. <u>Summary Judgment Standards</u>.

The standards for summary judgment are well established. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253 (1968)).  The Court is not duty bound to search the entire record in an effort to establish a lack of material facts.  Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992); InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. den., Superior Roll Forming Co. v. InterRoyal Corp., 494 U.S. 1091 (1990).  Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Id</u>. at 250. "If the evidence is merely colorable, . . . , or is not significantly probative, . . . , the court may grant judgment." <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).

Although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, <u>Smith v. Hudson</u>, 600 F.2d 60, 63 (6th Cir. 1979), <u>cert. dismissed</u>, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986) (citations omitted).

2.   <u>Claims Against the Brown County Prosecutor</u>.

<u>Buckley v. Fitzsimmons</u>, 509 U.S. 259 (1993) and its progeny affirmed the use of a "functional" analysis to determine if a public prosecutor is entitled to absolute or to qualified

-11-

immunity from civil rights claims based on acts taken under color
of state law.  A public prosecutor is generally entitled to
absolute immunity when acting as the state's advocate.
Investigative or administrative acts may not be absolutely immune
under the functional approach, necessitating qualified immunity
review.

Construing Plaintiff's complaint and her pleadings most
broadly in view of her pro se status, Plaintiff asserts the
county prosecuting attorney (1) refused to bring more serious
charges against McElroy after the December 2002 incident; (2)
conspired with the McElroys and the state court judge to deprive
Plaintiff of a fair trial on the trespass charge; (3) insisted
that Plaintiff attend a fence line meeting called by the Township
Trustees; (4) conspired with the Trustees and others to unfairly
burden Plaintiff with the costs of the partition fence; (5)
conspired with the McElroys and other county defendants to
condemn Plaintiff's property; and (6) refused to prosecute or
adequately investigate additional incidents of harassment or
pursued.

The prosecutor is entitled to absolute immunity for all of
the conduct in prosecuting the criminal trespass trial and the
trial preparations, as the prosecutor was acting as the state's
advocate in that role.  Plaintiff is clearly unhappy with the
verdict; but that does not avoid absolute immunity, one purpose

-12-

of which is to protect the prosecutor from unhappy litigants. The same conclusion applies to the prosecutor's representation of the Township Trustees in performing their mandatory duties concerning the partition fence, and to any involvement the prosecutor may have had in prosecuting the Health Department's condemnation proceedings.[1]

Plaintiff also alleges the prosecutor failed to investigate her complaints of racial harassment, and failed to file additional charges based on those incidents.  Investigatory or administrative acts may not be protected by absolute immunity. See, e.g., <u>Kalina v. Fletcher</u>, 522 U.S. 118, 127 (1997) [prosecutor who executed factual certification supporting arrest warrant acting as complaining witness, not as prosecutor, and not entitled to absolute Section 1983 immunity].  However, as discussed below concerning Plaintiff's "failure to investigate" allegations against the Sheriff, the Prosecutor is entitled to qualified immunity from these claims.

3.  <u>Claims Against the Brown County Sheriff</u>.

Plaintiff's claims against the Brown County Sheriff are largely based on her allegations that the sheriff and his

---

[1] The record does not clearly reflect any role the prosecuting attorney played in the initiation of the Health Department's complaint.  Plaintiff alleges that the prosecutor obtained a search warrant for the Health District in June 2005, and attended a November 2005 meeting.  Both of these acts are entitled to absolute immunity.

deputies failed to adequately respond to her complaints about harassment, trespassing and intimidation by her neighbors (and perhaps others).  Incidents that Plaintiff cites include several cars parked near her house at night, and a bullet shot through a window of her home.  Plaintiff submits one sheriff's report documenting a complaint from Plaintiff's neighbor, stating that Plaintiff was dancing or shouting through the woods to try to scare away deer.  This report notes possible alcohol or drug involvement, which Plaintiff suggests shows that the deputies were prejudiced against her and refused to take her complaints seriously.  Plaintiff also accuses the county prosecutor of failing to fully investigate and file charges based on her complaints, as noted above.

To determine whether the prosecutor, the sheriff, or any state or local official is entitled to qualified immunity, the Court must determine whether a constitutional violation occurred; if so, was the constitutional right "clearly established" from the standpoint of a reasonable public official; and if so, was the official conduct objectively unreasonable given the clearly established right in question.  See Williams v. Mehra, 186 F.3d 685, 691 (6th Cir. 1999) (en banc) (internal quotations omitted).

The threshold question for both Section 1983 and qualified immunity analysis is whether Plaintiff has been deprived of a federal constitutional or statutory right.  It is questionable

-14-

that Plaintiff's complaints of harassment, intimidation or fear of harm from private citizens is a constitutional violation.  But assuming that Plaintiff's allegations taken as a whole (including the property damage) do establish a violation, the governmental defendants have not injured Plaintiff or her family.

In <u>Jones v. Reynolds</u>, 438 F.3d 685 (6th Cir. 2006), the Sixth Circuit observed that "Nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors."  <u>Id</u>. at 690 (quoting <u>DeShaney v. Winnebago County Dept. of Soc. Servs.</u>, 489 U.S. 189, 195 (1989)).  Two exceptions to the <u>DeShaney</u> rule exist.  The first is when the State has created a special relationship with an individual by restraining that individual's freedom, typically applied to people in state custody.  This exception does not apply here.

The second <u>DeShaney</u> exception is the "state created danger" doctrine.

> This doctrine integrates with §1983's two requirements as follows: An individual is deprived of a substantive due process right - life, liberty, or property - by a private actor, which satisfies §1983's deprivation requirement.  That actor was enabled by the State to a degree that the plaintiff can rightly hold the State liable for its failure to protect him from the private deprivation. Section 1983's state action requirement is satisfied by the state-created-danger doctrine's three-element test, which ensures that the state acted (1) affirmatively, (2) with respect to the plaintiff in particular,

-15-

and (3) with the requisite culpability to
establish a substantive due process violation
under the Fourteenth Amendment.

Barber v. Overton, ___ F.3d ___, 2007 U.S. App. LEXIS 18320, slip

op. at 9 (6th Cir., August 2, 2007) (Cook, J., concurring).

To properly establish a state-created danger claim, Plaintiff

must show (1) an affirmative act by a state actor that creates or

increases a risk that Plaintiff would be exposed to private acts

of violence, (2) a special danger to Plaintiff, and (3) that the

defendant knew or should have known that the act specifically

endangered Plaintiff.  McQueen v. Beecher Community Schools, 433

F.3d 460, 464 (6th Cir. 2006), citing Kallstrom v. City of

Columbus, 136 F.3d 1055, 1066 (6th Cir. 1998).  Taking all of the

evidence and giving Plaintiff the benefit of every reasonable

inference, she has not established that any of the governmental

defendants affirmatively acted in a manner that **created** or

**increased** Plaintiff's risk of exposure to private acts of

violence.

     The Sixth Circuit observed in Jones that the question of

whether governmental conduct should be treated as a failure to

act or as an affirmative act may be abstractly difficult in some

cases.  However, Jones specifically noted that the Circuit has

"always treated governmental conduct as falling on the inaction

side of the line when it does not create or increase the risk of

peril posed by the private actor."  Id. at 692 (internal

-16-

citations and quotations omitted). Many cases addressing this
issue make it clear that inaction, or a failure to prevent harm,
are insufficient to establish liability. See, e.g., McQueen v.
Beecher Community Schools [teacher left student with known
violent tendencies alone in a classroom with other students, and
student shot and killed another student; teacher did not increase
victim's risk of harm); Schroder v. City of Fort Thomas, 412 F.3d
724 (6th Cir. 2005) [city's failure to respond to parents'
complaints about non-enforcement of speed limit before their
child was killed by speeding car was not an affirmative act];
Cartwright v. City of Marine City, 336 F.3d 487, 493-494 (6th
Cir. 2002) [police offered man who was walking along shoulder of
a dark two-lane highway a ride, then dropped him off in a
convenience store parking lot when they picked up a prisoner; the
man later wandered two miles onto a highway and was killed;
police took no "affirmative act" subjecting them to Section 1983
liability]; Bukowski v. City of Akron, 326 F.3d 702 (6th Cir.
2003) [police not liable when they returned a mentally disabled
woman to home of man who previously assaulted her, and who then
raped her]; and Jones v. Union County, 296 F.3d 417, 431 (6th
Cir. 2002) [failure to serve ex parte order of protection on an
abusive spouse not an affirmative act, despite lengthy record of
complaints to police about abusive spouse's conduct].

Here, Plaintiff has not established that anyone from the

-17-

Brown County Sheriff's Office or the county prosecutor's office affirmatively acted in a manner that created or increased any risk that Plaintiff faced from private actors.  The Sixth Circuit has rejected the theory that police officers' "failure to act" in response to victim complaints about a specific individual emboldened that individual to commit a criminal act, thus transforming inaction into affirmative action.  See, e.g., <u>Brooks v. Knapp</u>, 2007 U.S. App. LEXIS 5966 (6th Cir., March 7, 2007), rejecting claim that police officers increased decedent's vulnerability to danger when they failed to detain her ex-spouse, who had threatened her on several occasions and was in police custody the night of her murder.  Police released the ex-spouse without warning decedent, and he then broke into her home and killed her (and then himself).

Plaintiff repeatedly asserts that the sheriff and the prosecutor failed to respond to and investigate her complaints because of her race.  But there is no testimony and there are no facts in the record that support any reasonable inference that this is the case.  Rule 56 requires Plaintiff to come forward with admissible evidence supporting the allegations in her complaint of racial animus and intentional misconduct by the sheriff or the prosecutor.  She has failed to carry that burden.

In the absence of an affirmative act that creates or increases Plaintiff's risk of injury from other private citizens,

-18-

Plaintiff has not established a "state created danger" that would
be sufficient to overcome the qualified immunity granted to the
county sheriff and the county prosecutor.

The county defendants have also argued that Plaintiff's
claims are barred by the applicable two-year statute of
limitations, as all of her claims arise out of the August 2003
trial.  It is clear that any claims based on events at the 2003
trial are time-barred.  However, the Court need not analyze this
argument in detail, due to its conclusion that the sheriff and
the prosecutor are entitled to immunity.

4.  <u>Claims Against the Brown County Commissioners</u>.

Plaintiff does not make any specific allegations against the
County Commissioners.  The record contains no documents or other
evidence suggesting that the Commissioners were directly involved
in any of the incidents of which Plaintiff complains.  It is
beyond dispute that counties, cities, and local officers sued in
their official capacities cannot be vicariously liable under
Section 1983 for the actions of subordinate officers.  See <u>Monell</u>
<u>v. Dept. of Soc. Servs</u>., 436 U.S. 668, 691 (1978); <u>City of Canton</u>
<u>v. Harris</u>, 489 U.S. 378, 385 (1989).  The County Commissioners
might be subject to liability if the challenged action is taken
pursuant to municipal policy or law that deprives plaintiff of
constitutionally protected rights.  <u>Monell</u>, 436 U.S. 668, 690.
Section 1983 "plainly imposes liability on a government that,

-19-

under color of some official policy, 'causes' an employee to violate another's constitutional right." Id.  In order to succeed on such a claim, Plaintiff must show (1) a county custom or policy that (2) caused a deprivation of her constitutional rights.

Plaintiff does not allege or allude to any official Brown County law or policy that might give rise to a basis for Monell liability.  In the absence of any facts or evidence raising even an inference of the existence of an unconstitutional or discriminatory policy or custom in Brown County, the Court concludes that the County Commissioners are entitled to entry of judgment in their favor.

5.  Claims Against the Pleasant Township Trustees.

Plaintiff's claims against the Township Trustees are based on the incidents and events surrounding the boundary dispute and the partition fence.  Plaintiff asserts that the boundary and partition dispute was essentially a subterfuge for permitting ongoing trespassing and harassment against her and her family.

Ohio statutes governing land boundary partition fences include Ohio Revised Code 971.04, imposing duties on local township trustees:

> When a person neglects to build or repair a
> partition fence, or the portion thereof which
> he is required to build or maintain, the
> aggrieved person may complain to the board of
> township trustees of the township in which
> such land or fence is located.  Such board,

-20-

> after not less than ten days' written notice
> to all adjoining landowners of the time and
> place of meeting, **shall** view the fence or
> premises where such fence is to be built, and
> assign, in writing, to each person his equal
> share thereof, to be constructed or kept in
> repair by him.

(Emphasis added)

The Trustees thus have a mandatory duty to act when an aggrieved person notifies the Trustees of a boundary fence complaint. The statute plainly commands the Trustees to meet and view the premises, and then to apportion the responsibility for the partition fence between the adjoining landowners.

The actions of the Pleasant Township Trustees after receipt of the McElroy complaint were statutorily required. The Trustees noticed meetings, they viewed the premises, and then apportioned responsibility for construction and maintenance of the fence. There is simply no evidence in the record that gives rise to a reasonable inference that any of these actions were illegal, or that their response to McElroy's complaint amounted to racial discrimination aimed at Plaintiff and her family. Plaintiff's own representative stated in his letter to Trustee Hanselman that a serious conflict existed with the McElroys about a specific section of the boundary. (Plaintiff's Exhibit G-13) The Trustees' performance of their statutory duties to try to ease or eliminate this conflict does not give rise to Section 1983 liability.

-21-

Plaintiff's motion does not specifically identify which constitutional rights the Trustees allegedly violated, but she mentions the Fourth, Fifth, Ninth and Fourteenth amendments.  The Trustees followed Ohio statutory mandates, they provided notice of their actions, and they did not "seize" Plaintiff's property.  Plaintiff provides nothing to suggest that the Trustees performed their duties any differently because of Plaintiff's race.

Plaintiff does allege that when she confronted the bulldozer operator hired by the McElroys, he told her that the Trustees said he could go over her property as much as he wanted.  (Complaint ¶5)  McElroy informed the Trustees on February 4 that he had hired a bulldozer.  There is nothing in the record establishing that the Trustees informed Plaintiff of this fact, which Plaintiff contends demonstrates the Trustees' disregard of her rights.  There is no dispute, however, that Plaintiff was informed by the McElroys' attorney about the partition action.  The attorney's January 16, 2003 letter predates any action by the Trustees, and put Plaintiff on notice that her adjoining landowner was pursuing statutory boundary procedures.

In any event, whether or not the Township Trustees could be liable in some fashion for property damages stemming from the bulldozing incident is a question squarely raised in Plaintiff's lawsuit pending in the Brown County Common Pleas Court.  Her complaint there alleges that the bulldozing damaged her property

-22-

by destroying trees and fences, causing land erosion and altering
water flow, and devaluing her property.  Her claim against the
Trustees alleges that they are or may be liable for these
damages.  (See Doc. 43, Exhibit 2)

Under <u>Younger v. Harris</u>, 401 U.S. 37 (1971) and its progeny,
this Court should abstain from asserting jurisdiction when (1) an
ongoing state judicial proceeding raises the same issues between
the same parties; (2) important state interests are at stake in
the state case; and (3) plaintiff may raise constitutional
challenges in that state proceeding.  Plaintiff's state court
complaint raises the very same issue she raises here concerning
the Trustees' potential liability.  An important state interest
is clearly at stake in the state lawsuit, the Trustees' assertion
of political subdivision immunity under Ohio Revised Code 2744.01
et seq.  And nothing prevents Plaintiff from raising in her state
court action any constitutional challenges to the state's
partition fence statutes or their application by the Trustees to
her property.  This Court will therefore abstain from further
adjudication of Plaintiff's claims against the Township Trustees,
and will dismiss those claims.

6.    <u>Claims Against the Federal Bureau of Investigation</u>.

Plaintiff also seeks summary judgment against the "United
States."  Her motion cites <u>Bivens v. Six Unknown Named Agents</u>,
403 U.S. 388 (1971) as a basis for her claims, which are

-23-

apparently based on the actions or inactions of unidentified FBI agents.

There are a few references in the record to Plaintiff's interactions with the FBI and the Department of Justice:

(1) Brown County Chief Dunn sent a package of reports and videotapes to the FBI in January 2003.  According to his file memo, he was told that the case had been passed on to the Justice Department for further investigation.  (2) Plaintiff's summary judgment motion states she met with the FBI in February 2003.  (3) On August 17, 2005, the Cincinnati FBI office wrote to Plaintiff (referring to a specific case number), to inform her about the Justice for All Act of 2004 and her rights under this new statute.  The letter does not discuss the status of any investigation. (Exhibit H-13)  (4) On August 25, 2005, Plaintiff met with an Assistant United States Attorney, along with two representatives of the Southern Christian Leadership Conference, to discuss what Plaintiff describes as "the continuing dangerous and unsafe situation" she and her family were facing.  Plaintiff's September 13 letter summarizing her meeting is Exhibit H-16.  A September 19 letter from the AUSA states he sent her letter to the Civil Rights Division in Washington, and to the FBI in Cincinnati.  The record does not reflect any additional contact with federal authorities.

As noted above, the United States has not appeared in this

case although Plaintiff attempted to serve the FBI (see Doc. 48).  The Court need not decide if this service was properly effectuated, because the Court concludes *sua sponte* that Plaintiff has failed to state a cognizable claim against the FBI, any of its agents, the Department of Justice, or the United States.  At the very best, Plaintiff asserts that federal agents have not investigated her complaints to her satisfaction, and have not prosecuted anyone for hate crimes.  This does not constitute a basis upon which the FBI or the United States could be liable to Plaintiff.

7.  <u>Conspiracy and Other Claims</u>.

Finally, Plaintiff cites several other statutes upon which she rests her claims, including 42 U.S.C. §§1981, 1982 and 1985, and broadly alleges that all of the defendants conspired with the McElroys.  The Court recognizes Plaintiff's firmly held belief that she and her family have suffered from prejudice and harassment.  It is obvious that Plaintiff believes the authorities have not done enough.  However, Rule 56 requires Plaintiff to do more than rest upon her allegations and her beliefs, no matter how strongly she holds those beliefs.  As discussed above with respect to her Section 1983 claims, Plaintiff has not alleged any facts suggesting the existence of a conspiracy, and has not come forward with any evidence giving rise to any reasonable inference that any of the state defendants

-25-

have intentionally discriminated against her and her family on account of her race. These claims are therefore dismissed as well.

### CONCLUSION

For all of the foregoing reasons, Plaintiff's motion for summary judgment (Doc. 38) is denied. The motion to dismiss filed by the Brown County Sheriff's Office, Brown County Prosecuting Attorney's Office, and the Brown County Commissioners (Doc. 29) is granted on the merits. The motion for summary judgment of the Pleasant Township Trustees (Doc. 43) is granted. All claims against the federal defendants, including an unknown FBI agent, the Federal Bureau of Investigation, and the Department of Justice, are dismissed *sua sponte*.

**THIS CASE IS CLOSED.**

DATED: September 4, 2007          s/Sandra S. Beckwith
                                  Sandra S. Beckwith, Chief Judge
                                  United States District Court